U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 MAY 16  PM 1: 31

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

NICK NEFF and MATTHEW McCREA,
individually and on behalf of all similarly
situated individuals,

      Plaintiffs,

      v.

FLOWERS FOODS, INC., CK SALES CO.,
LLC, and LEPAGE BAKERIES PARK
STREET, LLC,

      Defendants.

Case No. 5:15-cv-254

**DECISION ON MOTION TO DECERTIFY CLASS UNDER THE FAIR LABOR
STANDARDS ACT AND TO CERTIFY CLASS UNDER FED. R. CIV. P. 23
(Docs. 251, 252)**

Plaintiffs work as distributors for Defendants Flowers Foods, Inc. ("Flowers Foods"),

LePage Bakeries Park Street, LLC ("LePage"), and CK Sales Company, LLC ("CK Sales").

They deliver bread, snacks, and other baked goods produced by Defendants to stores and other

retail locations.  Prior to 2012, most Plaintiffs were full-time employees of LePage and received

overtime wages after 40 hours of work each week.

In 2012, Flowers Foods acquired LePage.  Flowers Foods is the second-largest

commercial bakery company in the United States.  Flowers Foods follows a business model in

which most distributors are classified as independent contractors.[1]  In the months following the

acquisition, Plaintiffs were presented with identical distribution agreements which described this

new business arrangement.  As independent contractors, they no longer received overtime pay.

---

[1] Flowers Foods continues to employ some delivery drivers as conventional, full-time
employees.  These drivers are not parties to this lawsuit.

1

Plaintiffs have filed suit, claiming that Defendants misclassified distributors as independent contractors, thus depriving them of overtime wages due under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* A subset of Plaintiffs who are located in Vermont have filed claims under Vermont law seeking compensation for alleged unlawful deductions from their pay and other damages. All Plaintiffs also seek injunctive and declaratory relief establishing their right as employees to receive overtime pay.

On May 5, 2016, Plaintiffs filed a motion for conditional certification under 29 U.S.C. § 216(b), which authorizes collective enforcement of FLSA violations. (Doc. 31.) This court issued a decision granting conditional certification on November 7, 2016. (Doc. 56.)

Currently pending before the court are Defendants' motion for decertification of the conditionally certified FLSA collective action (Doc. 251) and Plaintiffs' motion for class certification of their Vermont law claims under Rule 23 of the Federal Rules of Civil Procedure (Doc. 252).

## BACKGROUND

### I.      Procedural History

This action commenced in December 2015. (Doc. 1.) It is one of approximately two dozen lawsuits filed around the United States against Flowers Foods and its subsidiaries.[2] These

---

[2] *See, e.g., Noll v. Flowers Foods, Inc.*, No. 1:15-CV-00493-LEW, 2019 WL 206084 (D. Me. Jan. 15, 2019), *appeal docketed, Noll v. Flowers Foods, Inc.*, No. 19-8001 (1st Cir. Jan. 29, 2019); *Goro v. Flowers Foods, Inc.*, No. 17-CV-02580-JLS-JLB, 2018 WL 3956018 (S.D. Cal. Aug. 17, 2018); *Richard v. Flowers Foods, Inc.*, Civil Action No. 6:15-2557, 2018 WL 5305377 (W.D. La. Aug. 13, 2018); *Wiatrek v. Flowers Foods, Inc.*, No. SA-17-CV-772-XR, 2018 WL 718548 (W.D. Tex. Feb. 5, 2018); *Schucker v. Flowers Foods, Inc.*, No. 16-CV-3439 (KMK), 2017 WL 3668847 (S.D.N.Y. Aug. 24, 2017); *Medrano v. Flowers Foods, Inc.*, Civ. No. 16-350 JCH/KK, 2017 WL 3052493, at *1 (D.N.M. July 3, 2017); *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464 (N.D. Cal. 2017); *Rosinbaum v. Flowers Foods, Inc.*, 238 F. Supp. 3d 738 (E.D.N.C. 2017); *Carr v. Flowers Foods, Inc.*, Civil Action No.15-6391, 2017 WL 393604 (E.D. Pa. Jan. 26, 2017); *Stewart v. Flowers Foods, Inc.*, Case No. 15-CV-1162-JDB-EGB, 2016 WL 5122041

cases challenge the designation of distributors as independent contractors. The action is a "hybrid" action that includes a claim for collective relief under the FLSA and a class action claim seeking damages under Vermont law. (Doc. 1 at 14–21.) The FLSA Plaintiffs include distributors from Vermont, New Hampshire, Massachusetts, Connecticut, Rhode Island, and portions of New York. The proposed class action concerns Vermont residents only and is limited to claims arising under Vermont law.

In November 2016, this court issued a decision granting conditional certification under the FLSA. (Doc. 56.) The court's order established an "opt-in" deadline of March 1, 2017, for any distributor to join the lawsuit. Seventy-three individual Plaintiffs have joined the FLSA claim. Thirty-three of these Plaintiffs deliver products for a bakery located in Vermont. These Plaintiffs also seek recovery under Vermont law for alleged unlawful deductions.

The parties completed discovery, including expert disclosures, in July 2018. (Doc. 227.) They stipulated to a deadline of September 22, 2018, for the filing of motions related to class certification. (*Id.*)

On March 22, 2016, the court held a hearing concerning Defendants' motion to decertify the FLSA class (Doc. 251) and Plaintiffs' motion to certify a class on Vermont law issues under Rule 23 of the Federal Rules of Civil Procedure (Doc. 252). (Doc. 277.) The court addresses both motions in this decision.

---

(W.D. Tenn. Aug. 12, 2016), *report and recommendation adopted*, Case No. 15-CV-1162, 2016 WL 5118309 (W.D. Tenn. Sept. 20, 2016); *McCurley v. Flowers Foods, Inc.*, No. 5:16-CV-00194-JMC, 2016 WL 6155740 (D.S.C. Oct. 24, 2016); *Coyle v. Flowers Foods Inc.*, No. CV-15-01372-PHX-DLR, 2016 WL 4529872 (D. Ariz. Aug. 30, 2016); *Martinez v. Flower Foods, Inc.*, No. CV 15-5112 RGK (EX), 2016 WL 10746664 (C.D. Cal. Feb. 1, 2016); *Rehberg v. Flowers, Baking Co. of Jamestown, LLC*, No. 3:12-CV-00596-MOC-DSC, 2015 WL 1346125, at *1 (W.D.N.C. Mar. 24, 2015).

## II.   Facts

The principal facts relevant to the class certification issues under both the FLSA and Rule 23 are not in dispute.

Prior to 2012, LePage produced bread and other baked goods in multiple locations in New England.  LePage employed distributors to pick up the product at a bakery or warehouse and deliver it to customers on fixed routes.  The distributors drove trucks owned or leased by LePage.  LePage paid the distributors a combination of hourly wages, including overtime after 40 hours, and commissions.  The distributors also received vacations, sick time, and other benefits.

After acquiring LePage, Flowers Foods introduced its own business model.  It required distributors who wished to deliver its products to sign a standard "Distributor Agreement." (Doc. 251-2.)  The agreement described a distributor as an "independent contractor" who purchased the bread and other baked goods, resold the product to customers on the route, and sold back any returns or leftover product to a thrift outlet run by Flowers Foods.  (*Id.* at 1, 4, 11–12.)  Each distributor was required to purchase his or her route from Flowers Foods.  (*Id.* at 1–3, 17.)  Distributors were required to organize their business as a corporation.  (*Id.* at 4, 33.)  They were required to purchase the company trucks, lease trucks from a specified company, or buy their own.  (*Id.* at 9; *see also* Doc. 254-34 at 29.)  They were required to obtain and keep insurance at prescribed levels.  (Doc. 251-2 at 9; *see also* Doc. 254-34 at 33.)  Flowers Foods offered financing for the purchase of routes and vehicles.  It also offered the services of an insurance broker.  Distributors were not required to use these in-house services and were permitted to buy their own vehicles and obtain their own financing if they wished.

Many features of the distributor position remained the same before and after the acquisition by Flowers Foods. All distributors continue to make use of handheld computers which track their orders and the details of each delivery. These computers are connected to a central sales office at LePage, which enters daily orders for each location based on historical levels of purchases. There is a factual dispute over how much discretion a distributor can exercise in altering these central orders. The times and frequency of visits to large accounts, such as Walmart or large supermarket chains, are set through discussions between representatives of the stores and LePage. Staff at LePage communicate these requirements to the distributors. Distributors who violate these orders can be sanctioned in various ways, including possible termination of their right to service a route. In addition to bread deliveries, distributors are required to visit store locations to freshen the displays ("pull-ups") and remove out-of-date product.

Other features of the distributor position were introduced after Flower Foods acquired LePage Bakeries. Distributors can sell their route to another driver subject to approval by LePage and Flowers Foods. (Doc. 251-2 at 12–13.) Distributors can buy additional routes, either from LePage Bakeries or from a fellow distributor. Distributors are no longer responsible for driving their route personally. (*Id.* at 14.) They can hire substitutes for their own work or subcontract with other distributors to service additional routes. (*Id.*) If distributors leave the bakery delivery business altogether and lack an approved buyer for their route or routes, they can return the route to LePage and receive in return the total "paid-in equity" they had paid to LePage since signing the distribution agreement. (*Id.* at 3, 10.)

Faced with this new business plan, distributors who continued to service their routes took one of three courses. Some purchased the route they had been driving already and continued to

work on their own.  These distributors might also hire helpers to assist them in driving and

delivering product.  Other distributors continued to drive themselves but added territory and

hired additional drivers whom they paid to service the new routes.  A few stopped driving

altogether and acquired multiple routes which they serviced by hiring drivers.  As distributors

left or retired, they sold their routes to new distributors who serviced the routes in one of the

three manners described above.  In some cases, Flowers Foods took back a route and sold it to a

new distributor itself.

## III.  Substantive Legal Issues

Plaintiffs allege that Defendants violated the FLSA and Vermont law by misclassifying

distributors as independent contractors rather than employees.  Both the FLSA and Vermont

employment law have developed tests or legal standards to determine whether a worker is

properly classified as an independent contractor or an employee.

### A.  FLSA Economic Realities Test

The FLSA defines an employee as "any individual employed by an employer."  29

U.S.C. § 203(e)(1).  To employ is defined as "to suffer or permit to work."  *Id.* at § 203(g).

Given the circularity of these definitions, courts have developed the "economic reality test" to

provide substantive criteria for distinguishing between employees and independent contractors.

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988) (citing *United States v.*

*Silk*, 331 U.S. 704, 716 (1947)).  In applying the test, courts consider the following factors:

> (1) the degree of control exercised by the employer over the workers, (2) the
> workers' opportunity for profit or loss and their investment in the business, (3) the
> degree of skill and independent initiative required to perform the work, (4) the
> permanence or duration of the working relationship, and (5) the extent to which the
> work is an integral part of the employer's business.

*Id.*  No single factor controls the determination, and the list of factors is non-exclusive.  *Id.* at

1059.  Rather, the economic reality test calls for the court to consider the relationship between

the worker and the employer as a whole. *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 140 (2d Cir. 2017). "The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059; *accord Saleem*, 854 F.3d at 139.

### B.    Vermont Statutory Test

For purposes of Vermont law, whether a worker is an employee or an independent contractor for overtime purposes is determined by the "ABC" test, which appears at 21 V.S.A. § 341(1):

> (1)  "Employee" means a person who has entered into the employment of an employer, where the employer is unable to show that:
>
> > (A)  the individual has been and will continue to be free from control or direction over the performance of such services, both under the contract of service and in fact; and
> >
> > (B)  the service is either outside all the usual course of business for which such service is performed, or outside all the places of business of the enterprise for which such service is performed; and
> >
> > (C)  the individual is customarily engaged in an independently established trade, occupation, profession, or business.

The ABC test is "concomitant," which means that the party seeking to establish independent contractor status for a worker must prove all three factors. *Bluto v. Dept. of Emp't Sec.*, 135 Vt. 205, 207 (1977). Unless all three factors are present, a worker is presumed to be an employee. *Price v. Dep't of Emp't & Training*, 150 Vt. 78, 78 (1988).

### ANALYSIS

Although the criteria for certifying collective or class litigation are similar under the FLSA and Rule 23 of the Federal Rules of Civil Procedure, they require separate consideration. The FLSA authorizes collective actions if the employees are "similarly situated." 29 U.S.C. §

216(b).  The meaning of the phrase "similarly situated" has developed through case law.  Only the claims of employees who choose to "opt-in" after receiving notice may be adjudicated.  The collective resolution of similar claims arising in the workplace plays an important role in furthering the "broad remedial goal of the statute [which] should be enforced to the full extent of its terms."  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989).

In contrast, class certification under Rule 23 requires the application of rules-based, multi-factorial tests which apply equally to many forms of class actions.  Analysis begins with the four prerequisites listed at Rule 23(a) and requires consideration of the three types of class actions described at Rule 23(b).

The court will consider the certification issues separately under the FLSA and Rule 23.  The two classes differ in their membership and in the legal test governing the determination of whether the drivers are employees or independent contractors.  The court will start with the FLSA because the FLSA claims are made on behalf of a much larger group of Plaintiffs and because Congress specifically authorized collective adjudication of disputes arising under the FLSA.  The court will then consider certification of the Vermont claims only under Rule 23.

## I.    Collective Litigation Under the FLSA

Courts within the Second Circuit commonly follow a two-step approach to certification of a collective action under § 216(b) of the FLSA.  "The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred."  *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).  The second step requires the court to review fuller record and determine whether the plaintiffs who have chosen to opt in "are in fact 'similarly situated' to the named plaintiffs.  The action may be 'de-certified' if the record reveals that they

are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Id.* This two-step approach is followed by federal courts around the United States. *See, e.g.*, *Rehberg*, 2015 WL 1346125, at *14; *Coyle*, 2016 WL 4529872, at *2.

Plaintiffs bear the burden of proving that members of the proposed class are similarly situated. *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). While the court's inquiry on a motion for decertification is more exacting than at the preliminary conditional stage, "[a]ll that is required is a persuasive showing that the original and opt-in plaintiffs were common victims of a FLSA violation pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation." *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 367 (S.D.N.Y. 2014) (quoting *Pefanis v. Westway Diner, Inc.*, No. 08 Civ. 002 (DLC), 2010 WL 3564426, at *4 (S.D.N.Y. Sept. 7, 2010)).

The factors which a trial court considers in determining whether plaintiffs are "similarly situated" for purposes of the FLSA are most commonly:

- the factual and employment settings of the individual plaintiffs;
- the various defenses available to the defendant which appear to be individual to each plaintiff; and
- fairness and procedural considerations.

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260–61, n.38 (11th Cir. 2008); *accord Monroe v. FTS USA, LLC*, 860 F.3d 389, 397 (6th Cir. 2017), *cert. denied,* 138 S. Ct. 980 (2018); *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1113 (9th Cir. 2018); *see also Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 226 (3d Cir. 2016). Although the Second Circuit has not expressly adopted this three-step standard, it is commonly applied by other trial

courts within this circuit and across the United States.  *See, e.g.*, *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008); *Zivali*, 784 F. Supp. 2d at 460; *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 397 (W.D.N.Y. 2013), *aff'd sub nom. Gavin v. NVR, Inc.*, 604 F. App'x 87 (2d Cir. 2015).  Both sides in this case have followed this three point analysis with respect to the current decertification motion.  (Doc. 251 at 11; Doc. 260 at 24.)

### A.    Factual and Employment Settings of the Individual Plaintiffs

In many respects, the relationships between individual Plaintiffs and Flowers Foods are very similar.  When Flowers Foods introduced its business model of self-employed distributors, it required Plaintiffs to sign identical Distributor Agreements.  All Plaintiffs have the same core job responsibilities, which are delivering bread and snacks, straightening up the store displays, and removing stale product.  All use the same handheld computer devices to track their orders and deliveries.  All are subject to direction and discipline from sales managers and staff employed by Flowers Foods.  All exercise some discretion in adjusting orders to best meet customer requirements.  Although most accounts at large stores and supermarkets are credit accounts, many, if not all, distributors have some smaller cash accounts and exercise greater autonomy in how they bill and collect from these businesses.  Under the terms of their Distributor Agreements, all Plaintiffs are paid the same way: a piece rate for each item delivered with an adjustment for returns of unsold product.

The differences among Plaintiffs are almost entirely due to features of the distributor position introduced by Flower Foods, specifically the ability to acquire multiple routes and subcontract delivery work to helpers.  A number of Plaintiffs operate multiple routes through helpers.  (*See, e.g.*, Doc. 25-10 at 3–7.)  A few have sought to operate multiple routes without driving themselves, although it became clear at the hearing that such arrangements were few in

number and not necessarily long-lived.  In addition, the defense notes that distributors perceive their autonomy and discretion differently.  Some distributors believe they have substantial control over their daily operations.  Others believe that Flowers Foods controls their delivery work in all important respects.

In weighing the areas of similarity and difference, the court is not making a decision on the merits about whether the distributors are employees.  Rather, the court is seeking to determine whether the evidence can be applied to the substantive factors that comprise the economic reality test in a manner that generates a collective answer.  *See Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339 (ALC) (JLC), 2014 WL 5039431, at *4 (S.D.N.Y. Sept. 29, 2014) ("Plaintiffs must demonstrate at this stage that they are similar in 'relevant respects,' i.e., with respect to the factors relevant to this Court's determination of whether they are employees or independent contractors under the FLSA . . . .").  Put another way, the court is asking if the differences among distributors are so great that the factfinder cannot apply the factors in a consistent manner to all distributors.  Answering this question requires the court to return to the factors themselves.

### (1)  *Degree of control exercised by the employer over the worker*

The information before the court at this point indicates that the evidence concerning control is similar.  All distributors are subject to the same Distributor Agreement.  Their performance is monitored by the same national sales staff and is governed on the ground by the same handheld devices.  Their tasks throughout the day are similar.  The process of putting bread on the shelf in accordance with the store's plan and removing the stale product does not vary among distributors.

Defendants point to a number of variations among individual Plaintiffs' testimony regarding their daily operations, including whether they hired helpers, adjusted suggested product orders, altered suggested product placements, set their own delivery schedule and route, were disciplined by sales managers, or chose to wear a uniform.  (Doc. 251 at 16–24.)  These variations in distributors' daily work activities have little bearing on whether original and opt-in Plaintiffs are similarly situated.  *See Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 390 (W.D.N.Y. 2005) ("That these employees may have had different duties and performed different types of work is not particularly relevant to whether they are similarly situated with respect to plaintiff's claims.").  The relevant consideration is that Plaintiffs were subject to Defendants' common policy of classifying distributors as independent contractors, allegedly in violation of the FLSA, under the business model introduced by Flower Foods.  Proof that distributors were properly classified as independent contractors may include evidence that this common policy allowed variations in distributors' behavior.  But to the extent that variations in behavior are relevant to determining Defendants' degree of control over Plaintiffs, these issues may be resolved using common proof of distributors' alleged independence and economic freedom.  *Cf. Scovil v. FedEx Ground Package Sys., Inc.*, 886 F. Supp. 2d 45, 54 (D. Me. 2012) ("[W]hile there may be a *lot* of evidence to present to show variety [among workers' behavior], that is not the same as showing that common evidence does not predominate.").

There is a difference in the case of distributors who hire helpers.  Obviously it is the helper who must service the stores and follow the rules.  However, because "the definition of 'employ' in the FLSA cannot be reduced to formal control over the physical performance of another's work," Plaintiffs who hire helpers to perform day-to-day operations may still be employees if Defendants exercise functional control over the conditions of distributors' work.

*Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 70 (2d Cir. 2003); *see also Noll*, 2019 WL 206084, at *4 n. 3 ("A distributor could hire 'helpers' and still be an employee."). Since the Distributor Agreement provides that the distributor who owns a particular route is subject to discipline for a helper's mistakes (*see* Doc. 251-2 at 13–12), this difference among Plaintiffs does not weigh heavily in favor of a series of individualized determinations of degree of control. Similar evidence may be used to establish the degree of control Defendants exercise over distributors, regardless of whether Plaintiffs chose to personally service their territories.

### (2)     *Opportunity for profit or loss and the employees' investment*

The evidence before the court shows that all distributors have similar opportunities to acquire their route or add multiple routes. All are required to make an investment in the purchase of the route and in buying or leasing a delivery truck. The difference is that some drivers choose to acquire multiple routes or hire helpers and, in doing so, make a larger investment. But the evidence concerning the relationship between Flowers Foods and each distributor in this area is very similar.

### (3)     *Degree of skill and independent initiative*

The evidence before the court makes it clear that there are far more similarities in the operation of delivery routes than there are differences. The skills include driving a commercial vehicle, organizing and delivering the right mix of product to the right stores, removing the old product and straightening up the display, and doing all of this fast enough to complete the entire route in a reasonable period of time. It is not an easy job, but it is one which requires skills many people are able to develop. Individual distributors may be better or worse at these skills, but there is little difference in the type of skills which each brings to the delivery work.

Whether distributors' work required independent initiative may also be determined using common evidence. While Defendants contend that some distributors display more sales initiative and entrepreneurship than others, these "different tactics and attitudes" suggest variations in individual distributors' personal style, not their job requirements. (Doc. 251 at 27–29.) All distributors were instructed to carry out their jobs according to the Distributor Agreement. These requirements do not vary between individual Plaintiffs.

### (4)     Permanence and duration

The working relationship between Plaintiffs and Flowers Foods is governed by the Distributor Agreement. Under the terms of the Distributor Agreement and as owners of their routes, all distributors serve indefinitely, subject to potential termination. (Doc. 251-2 at 12.) The evidence will be the same for all.

### (5)     Extent to which the work is an integral part of the employer's business

This factor seeks to distinguish contractors who might perform an incidental service, such as window washing or tax accounting, from those whose work is at the core of the enterprise. *See Brock*, 840 F.2d at 1059. Defendants concede that the extent to which distributors' work is integral to Flower Foods's business "does not lend itself to a consideration of differences among the Plaintiffs." (Doc. 251 at 11 n. 24.) The court agrees. The evidence concerning the importance of "last mile" delivery to Flowers Foods will be the same for each distributor.

***

For the reasons discussed above, the court concludes that most of the evidence which the parties will submit on the economic reality test is similar from one distributor to the next. There is an important distinction between distributors with multiple routes and those who service only one route themselves. But this difference is one which can be developed before the factfinder

without great difficulty or inconvenience to the court or the parties.  Some distributors have taken advantage of the opportunity to acquire additional routes and others have chosen not to. This distinction is one difference among many common elements of evidence and does not require an individual lawsuit and hearing for each distributor.

**B.    Collective Evidence Concerning Defenses**

The court turns to the question of whether the defenses asserted by Defendants can be determined on the basis of common evidence in a collective action.  The defenses at issue are:

- Individual Plaintiffs lack standing to sue because they operate their business through corporations;

- Plaintiffs are exempt from the overtime provisions of the FLSA through operation of the Federal Motor Carrier Act;

- Plaintiffs are exempt from overtime by operation of the "outside sales exemption" in the FLSA; and

- Plaintiffs cannot establish their damages through commonly-applicable proof.

*(1)    Standing*

Defendants argue that the individual Plaintiffs lack standing to sue because they operate through corporations.  (Doc. 251 at 34.)  These corporations entered into Distributor Agreements with Defendants.  In Defendants' view, the individual plaintiffs have "no direct relationship with any Defendant, much less an employee/employer relationship." (*Id.* at 35.)  Defendants argue that the assertion of claims by individual distributors would require detailed inquiry into whether each distributor complied with corporate formalities. (*See id.*)  Plaintiffs respond that courts have uniformly rejected arguments that employees who are required to incorporate cannot sue in their independent capacity under the FLSA.  (Doc. 260 at 42.)

From the court's perspective, the standing argument raises a legal issue that may be determined on the basis of common evidence.  It is undisputed that the distribution agreement required former employees to form corporations and that all Plaintiffs did so.  Whether different distributors comply to a greater or lesser extent with corporate formalities is irrelevant.  It is highly likely that there is substantial variation in the keeping of minutes, the appointment of officers, and the filing of reports with the various Secretary of State offices.  But Defendants do not suggest that a distributor who is lax in these matters has an increased likelihood of being permitted to sue as an individual.  Nor do Defendants suggest that a distributor who meticulously maintains corporate formalities has a reduced likelihood of being permitted to sue as an individual.  Rather, the Defendants' argument is that *all* distributors who do business with Defendants as corporations cannot sue as individuals.  The court makes no ruling on the merits but concludes that the factual record necessary to answer this question is largely the same for all drivers, including those who neglect their corporate minutes or fail to hold annual meetings.

### (2)      *Motor Carrier Act Exemption*

Defendants seek to defeat all claims for overtime payment on the ground that, as a motor carrier, Flowers Foods is exempt from the FLSA.  (*See* Doc. 251 at 36.)  In order to avoid duplicative regulation of motor carriers by the FLSA and the Department of Transportation ("DOT"), 29 U.S.C. § 213(b)(1) provides that the FLSA does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49."  The parties agree that distributors operating traditional bread trucks are subject to DOT regulation due to the gross weight of these vehicles.  (*See* Doc. 251 at 36; Doc. 260 at 44.)  In 2008, Congress narrowed the exemption by providing that overtime compensation would be available to

16

"covered employees" whose duties "in whole or in part" included both work subject to DOT regulation and "duties on motor vehicles weighing 10,000 pounds or less." SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110–244, § 306, 122 Stat. 1572, 1621 (2008).

In this case, Plaintiffs argue the motor carrier exemption does not apply because they visit stores to clean up displays ("pullups") in their personal cars on days when they are not delivering bread in bulk. (Doc. 260 at 44.) This issue has both a factual and a legal dimension. There is some factual dispute between the two sides about how frequently drivers use their own cars to visit stores. There is disagreement as well about whether as a matter of law such mixed use of large and small vehicles defeats the motor carrier exemption.

The limited question at this stage is whether common questions of law and fact exist that justify representational litigation. *McGlone*, 49 F. Supp. 3d at 367. Defendants argue that "the individualized nature of this defense supports decertification because it impedes the efficient resolution of claims on a collective basis." (Doc. 251 at 37.) Because the motor carrier exemption "depends . . . upon the activities of the individual employees," an employer "must present evidence as to 'the character of the activities involved in the performance' of each plaintiff's job in order to determine whether [the defendant] owes individual employees overtime compensation." *Masson v. Ecolab, Inc.*, No. 04 CIV. 4488 (MBM), 2005 WL 2000133, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 235 (7th Cir. 1961)). However, the court is not persuaded that the motor carrier exemption defense requires decertification. Evidence that Plaintiffs are similarly situated does not require absolute uniformity of behavior. Just as there may be distributors who work 40 hours or less and are not due overtime, there may be distributors who always use the large vehicle and are subject to the

exemption.  But this inquiry is relatively simple and does not justify creating multiple lawsuits to reach an answer.

Moreover, the motor carrier exemption defense is not unique to a specific plaintiff. Defendants raise the motor carrier exemption defense against all Plaintiffs. (Doc. 251 at 34–35 n. 149).  A collective forum will not prevent Defendants from asserting the defense.  *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 382 (W.D. Pa. 2011).  And while its application might require specific factual inquiries about each Plaintiff's personal vehicle use, similar factual inquiries apply to each Plaintiff.  Decertification would only require the court to apply the motor carrier defense in over 70 separate trials, which would "hardly promote[] efficiency."  *Id.* Accordingly, common questions of law and fact justify collectively litigating whether the motor carrier exemption applies to Plaintiffs.  *See Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 741 (W.D. Tex. 2018) ([M]any of the specific fact questions cited by Defendants apply to each Plaintiff—i.e. Defendants raise the same defenses [including the motor carrier exemption] against most, if not all, Plaintiffs. This lends support to the notion that Plaintiffs are similarly situated.").

*Harrison v. Delguerico's Wrecking & Salvage, Inc.*, a case cited by Defendants to support their argument, helps illustrate this point.  Civil Action No. 13-5353, 2016 WL 826824, at *7 (E.D. Pa. Mar. 2, 2016).  In *Harrison*, the court granted decertification, in part, because the defendants raised employee exemptions as an affirmative defense.  *Id.* at *7.  The *Harrison* court found that the alleged employee exemptions indicated the original and opt-in plaintiffs were not similarly situated, reasoning that there were "various job duties among Plaintiffs, which results in numerous possible exemptions."  *Id.*  By contrast, it is undisputed in this case that Plaintiffs' job duties include driving bread trucks, and Defendants specifically raise motor carrier

exemption defenses against every Plaintiff. *Cf. id.* (distinguishing *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410–11 (W.D. Pa. 2000), which "was dealing with an exemption that would more efficiently be determined since all opt-in plaintiffs had substantially similar job duties."). The court therefore finds that the motor carrier defense asserted by Defendants does not warrant decertification.

### (3)    Outside Sales Exemption

Defendants invoke the "outside sales exemption" set forth at 29 U.S.C. § 213(a)(1) which excludes any employee engaged "in the capacity of outside salesman." Regulations further defining the term "outside salesman" appear at 29 C.F.R. §§ 541-500–541.504. These regulations limit the exemption to individuals whose "primary duty is: making sales . . . or obtaining orders or contracts for services for the use of facilities for which a consideration will be paid by the client or customer; and who is customarily and regularly engaged away from the employer's place of business in performing such primary duty." 29 C.F.R. § 541.500(a).

Whether distributors' primary duty in making sales is readily resolved through common evidence. Distributors' duties are set forth in identical Distributor Agreements. It is clear—even at this early stage of the litigation—that hauling bread to stores and putting it on the shelves are the principal tasks. These tasks cannot reasonably be described as making sales. The defense identifies no distributor who is primarily engaged in making sales.[3] For purposes of certification,

---

[3] The defense quotes a distributor named Louis Perciballi who testified in part, "So if you don't know business and how to distribute the bread you're not going to make no money." (Doc. 251 at 27 (citing Perciballi Dep. 52:12–53:24.) That testimony falls short of identifying Mr. Perciballi as primarily engaged in sales work. Defendants identify other actions by a distributor intended to increase sales, such as being meticulous about the shelf display (Michael Fitzgerald) or negotiating for extra display space (Robert Gasior). (*Id.* at 28.) These activities demonstrate that distributors' work *may* involve good salesmanship. It does not establish that generating sales is their primary responsibility.

the claim that some distributors are primarily salesmen and not delivery workers can be resolved through common evidence about the terms of the parties' agreement and the nature of the work.

### *(4)*      *Evidence of hours worked*

Defendants argue that the absence of company time records makes it impossible for plaintiffs to prove their overtime claims.  (Doc. 251 at 38.)  Plaintiffs respond that the law places the burden of missing information on the employer, not the employee.  (Doc. 260 at 39.)

The determination of individual overtime awards (if due) has to be an individualized inquiry since no two drivers work the same schedule.  However, "individualized inquiries into damages do not warrant decertification."  *McGlone*, 49 F. Supp. 3d at 369.  If such inquiries were an obstacle to collective resolution in FLSA overtime cases, few cases could ever be decided on a collective basis.[4]  Moreover, Plaintiffs challenge the company-wide policy of classifying distributors as independent contractors, not individualized instances of failure to pay overtime.  As discussed above, whether distributers are improperly classified as independent contractors—and therefore entitled to overtime pay—is subject to generalized proof.

In the event of a determination that the drivers are employees, it will be necessary to develop an individualized method of determining the amount of individual wage awards.  This process will be based on the discovery already provided by the drivers and a hearing process if settlement cannot be reached.  But this is not a sufficient reason to hold individual trials on all issues.

---

[4] *Cf. Mendez v. Radec Corp.*, 232 F.R.D. 78, 92–93 (W.D.N.Y. 2005), *adhered to sub nom. Mendez v. The Radec Corp.*, 260 F.R.D. 38 (W.D.N.Y. 2009)) ("In almost any class action in which there are claims for damages . . . each plaintiff must establish his entitlement to damages and the extent of those damages.  That alone does not mean that a class should not be certified.").

### C.      Fairness and Procedural Considerations

As the preceding discussion indicates, the factual issues concerning the supervision, autonomy, work practices and contractual relationship of the distributors and Flowers Foods are broadly similar across the territories and routes served by Plaintiffs in this case.  The likelihood that individual distributors could effectively present their claims against defendants in multiple, individual federal lawsuits is extremely small.  Factors of expense and the time demands on counsel make it impossible to file and prepare close to 100 lawsuits with individual claims of modest size.  The parties have already pursued a hybrid form of case preparation in which all Plaintiffs have answered interrogatories (and those who have not face dismissal) but depositions have gone forward on a representative basis.  The court has confidence in the skills of experienced counsel on both sides to cooperate in developing a trial process which reflects the same practicality and pragmatism.  Some issues, such as the amount of a particular distributor's wage award, will require an individual determination.  But the majority of issues, including the elements of Plaintiffs' case-in-chief and the likely defenses, can be resolved using evidence applicable to most distributors.  The defense will receive latitude in introducing evidence of the experience of outliers and any other employees who require special consideration.  But the record before the court at this stage strongly suggests that the requirements and execution of the distributors' job have far more in common from one distributor to the next than differences.  The court is satisfied that broad concerns of fairness favor a collective resolution of the FLSA claims.

## II.      Class Certification Under Rule 23

Plaintiffs have moved to certify a class of Vermont distributors pursuant to Fed. R. Civ. P. 23.  (Doc. 252.)  Plaintiffs claim that their misclassification as independent contractors resulted in unlawful deductions in violation of the Vermont Employment Practices Law

("VEPL"), 21 V.S.A. § 341 et seq., as well as the Consumer Protection Act ("CPA"), 9 V.S.A. § 2453.

Plaintiffs bear the burden of demonstrating that the proposed class meets the requirements of numerosity, commonality, typicality, and adequacy under Rule 23(a). They also bear the burden of demonstrating under Rule 23(b)(3) that common issues of fact and law predominate and that a class action is superior to other methods of resolving the controversy. Alternatively, Plaintiffs must demonstrate that Defendants have acted in a manner that applies generally to the class so as to make injunctive relief appropriate for the class as a whole. The Second Circuit has also recognized that Rule 23 contains an implied threshold requirement of ascertainability, "which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).

Plaintiffs' VEPL claim depends upon application of the "ABC test" discussed above. The Consumer Protection Act claim turns largely upon legal issues. The Act has not been applied in Vermont to employment relations disputes. A motion to dismiss is likely to resolve the claim on legal grounds in favor of the defense. If the Consumer Protection claim survives the motion, the court will consider whether it is appropriate for resolution as part of the class action.

### A.    Ascertainability

To satisfy the threshold ascertainability requirement, a class must "be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 264. Here, the proposed class consists of Flowers Foods distributors working in Vermont who have been classified as independent contractors. These criteria—Flowers Foods

workers identified by position, classification, and location—are objective and sufficiently definite. Prospective class members can be identified using Defendants' business records to determine whether they delivered Defendants' products in Vermont under Distribution Agreements. The court therefore finds the proposed class satisfies the ascertainability requirement.

**B.      Rule 23(a) Factors**

Plaintiffs must establish that the proposed class meets the four prerequisites listed under Rule 23(a): "(i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 119 (2d Cir.), *as amended* (Nov. 12, 2014) (citing Fed. R. Civ. Pro. 23(a)(1)–(4) and *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–02 (2d Cir. 2008)).

*(1)      Numerosity*

Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Thirty-three Vermont distributors have joined in this action. This is seven less than the 40 plaintiffs for whom numerosity is presumed. *Pa. Pub. Sch. Emps.' Ret. Sys.*, 772 F.3d at 120. "However, the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case," particularly the following factors: "(i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." *Id.* (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

Many of these factors support the conclusion that joinder is impracticable in this case. The purpose of the numerosity requirement is to ensure that the benefit of avoiding the burden on the court and the parties of hearing the cases individually justifies the time and difficulty inherent

in the class action process. A class of two or three would save no time or effort. Thirty-three

cases would represent a considerable burden to the court and to the parties to prepare and try as

individual lawsuits. Plaintiffs seek injunctive relief enjoining Defendants from classifying

distributors as independent contractors, which would affect all potential class members. Based

on the totality of the circumstances, the court is satisfied that the numerosity requirement is met.

### (2)   *Common questions of law or fact*

"A 'question[ ] of law or fact [is] common to the class' if the question is 'capable of classwide

resolution—which means that its truth or falsity will resolve an issue that is central to the validity

of each one of the claims in one stroke.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137

(2d Cir. 2015) (first quoting Fed. R. Civ. P. 23 (a)(2), then quoting *Wal-Mart Stores, Inc. v.

Dukes*, 564 U.S. 338, 350 (2011)). "Commonality requires the plaintiff to demonstrate that the

class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel.

Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "The claims for relief need not be identical for

them to be common; rather, Rule 23(a)(2) simply requires that there be issues whose resolution

will affect all or a significant number of the putative class members." *Johnson*, 780 F.3d at 137.

Although "this inquiry may sometimes overlap with merits issues, . . . the proponent of class

certification need not show that the common questions 'will be answered, on the merits, in favor

of the class.'" *Id.* at 138 (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S.

455, 459 (2013)).

The court finds that Plaintiffs' VEPL claims present common questions of law and fact

that can be resolved in a single stroke. The outcome of these claims depends on the application

of the three factors composing the "ABC test": (1) freedom from control and direction by

defendants; (2) activities outside the usual course of the defendants' business; and (3) an

independently established trade.  21 V.S.A. § 341(1).  These factors all present common issues of law and fact.  The distributors perform very similar assignments: delivering bread to stores on schedule.  They are all subject to a similar degree of centralized control through Defendants' sales staff.  The extent to which bread delivery is a usual aspect of the bakery business can be argued either way—but these arguments rest on the same facts concerning the nature of that business in general and the Flowers Foods business in particular.  Whether "bakery route driver" is an independent trade like that of plumbers or physicians can also be argued both ways—but the history and facts concerning the trade are common to each distributor.

The court recognizes that distributors vary in the scale of their operations, in their employment of sub-contractors, and, to some extent, in their willingness to pursue additional sales and other business opportunities.  But these differences are minor compared to the common facts and legal principles which the court must resolve under the ABC test.  The court therefore concludes that the commonality requirement is satisfied.

### (3)    *Typicality of claims and defenses*

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "This requirement 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).

Here, the class representatives all present the same claim for unauthorized deductions.[5] The amount allegedly owed to each distributor varies, but the claims have the same elements: the ABC test is not satisfied, and the employer made unlawful deductions.  The claims of the named

---

[5] The Vermont drivers' overtime claims are made in the FLSA cause of action.

Plaintiffs are no different from those of the other distributors and therefore meet the test for typicality.

Defendants contend that the named Plaintiffs' claims are not typical of the putative class because Plaintiff Neff owns only one territory that he services himself while Plaintiff McCrea has acquired multiple territories and hired helpers. However, these differences do not show that the named Plaintiffs' claims are atypical of the class. Each prospective class member's claim arises from the same course of events: Defendants' uniform policies of classifying distributors as independent contractors and deducting administrative and warehouse fees from distributors' weekly pay. All prospective class members were subject to these policies after signing Distribution Agreements that classify distributors as independent contractors, regardless of differences in the scale of their business operations. The court therefore finds that the typicality requirement is satisfied.

### (4)    *Adequate representation*

"The adequacy requirement is that 'the representative parties will fairly and adequately protect the interests of the class.'" *Brown*, 609 F.3d at 475 (quoting Fed. R. Civ. P. 23(a)(4)). "Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).

There are no conflicts among the class members or their representatives. Due to the "opt-in" nature of the FLSA class which includes the Vermont distributors, all class members have made the decision to assert labor law claims. Counsel for Plaintiffs is experienced and capable.

There is no reason why the named Plaintiffs and Plaintiffs' counsel cannot adequately represent the class.

### C.     Rule 23(b)(3) Factors

A court may certify a class under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "Rule 23(b)(3) also lists four factors—individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability—which courts should consider in making these determinations." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (citing Fed. R. Civ. P. 23(b)(3)(A)–(D)). "However, while these factors, structurally, apply to both predominance and superiority, they more clearly implicate the superiority inquiry." *Id.* (citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1278 (11th Cir. 2009)).

### *(1)     Predominance of common issues of law and fact*

The Rule 23(b)(3) predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 97 (2d Cir. 2018) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)). "The predominance requirement is satisfied if 'resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof,' and 'these particular issues are more substantial than the issues subject only to individualized proof.'" *Id.* (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

27

The court has addressed the issue of common issues of law and fact at some length in the FLSA portion of this ruling.  The same analysis that led the court to conclude that the FLSA test for employment status could be resolved through common evidence applies equally to the ABC test.  It is undisputed that all distributors were employees for purposes of the ABC test prior to the acquisition of LePage by Flowers Foods.  It is also undisputed that Flowers Foods sought to apply a new business model to all distributors and required them to enter into the same distributor agreement to continue working for the company.  Since the acquisition, Defendants exercise the same type of control over all distributors.  The nature of each distributor's profession and its role in Defendants' operation are the same.

The differences between distributors that Defendants present as sufficient to defeat class certification concern distributors' different responses to one primary factor: the opportunity to acquire multiple routes.  This opportunity was not available prior to the acquisition.  It has resulted in differences in the scale and nature of the distributors' work.  Some drive themselves.  Others hire a few helpers.  Some have put together multiple routes with multiple subcontractors.

None of these differences are fatal to the common resolution of the factual and legal issues presented by the ABC test.  A distributor with multiple routes is still subject to the same type of supervision as a distributor with only one.  Whether this supervision is sufficiently comprehensive as to render the distributor an employee is a merits question which the court is not addressing at this stage.  But the type and degree of supervision are the same among all drivers.  Similarly, the role of delivery driving in Defendants' business (the B prong) and the status of "distributor" as a traditional form of self-employment (the C prong) are similar across routes and distributors.

Defendants also argue that individual issues predominate because any damages owed for the alleged improper deductions must be determined on an individual basis. While such individual issues are "factor[s] that [courts] must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues," *Johnson*, 780 F.3d at 138, the Second Circuit has held that "individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)," *Roach*, 778 F.3d at 409 (citing *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010)). In this case, the issues central to establishing Defendants liability may be determined using common evidence. The court therefore finds that similarities between the proposed class members predominate over any differences.

### (2)     *Superiority of a class action*

Generally, "Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130–31 (2d Cir. 2013) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)). A class action is a superior method of adjudicating claims when "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" *Id.* (citing Fed. R. Civ. P. 23 advisory committee's notes.) To assess the superiority of a class action in this case, the court turns to the four final factors set out in Rule 23(b)(3). *See Sykes*, 780 F.3d at 82.

### (a)     *Class members' interest in individually controlling the litigation*

All class members purposefully "opted-in" to the FLSA cause of action. This is a strong indication that they have no interest in pursuing this litigation as individuals.

(b)      *Existing litigation*

The court has previously excluded Maine from this lawsuit because there is a similar

action already pending.  (Doc. 56 at 2, 7–8.)  Otherwise, there is no existing litigation known to

the court within the geographical area at issue.

(c)      *Desirability of concentrating the claims in the particular forum*

This factor does not seem relevant.

(d)      *Likely difficulties in managing the litigation*

"[M]anageability 'is, by the far, the most critical concern in determining whether a class

action is a superior means of adjudication." *Sykes*, 780 F.3d at 82 (quoting 2 William B.

Rubenstein, *Newberg on Class Actions* § 4.72 (5th ed. West 2014)).  Defendants maintain that

collectively litigating the prospective class members' claims will be unmanageable "given the

amount of individualized testimony the Court would need to hear from Defendants to rebut

Plaintiffs' claims." (Doc. 259 at 42.)  The court, however, is optimistic that this will be a

manageable action.  The class size is at the low end of the numerosity range.  The individual

aspects of the case, particularly the amount of any single claim for unlawful deductions, can be

determined in days, not weeks.  Counsel on both sides are experienced and cooperative with one

another and the court.  The history of these cases in other districts is that they tend to settle.  If

this case does not, the court has every reason to believe that counsel and the judge can develop a

factual record which will permit a decision on the ABC elements and, if needed, a series of

damage awards without undue difficulty.

**D.      Injunctive Relief Under Rule 23(b)(2)**

Under Rule 23(b)(2), a court may certify a class if "the party opposing the class has acted

or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." In the event that Plaintiffs succeed in their damages claim, the same application of the ABC test will govern their claim for prospective relief in the form of an order enjoining Defendants from making the unauthorized deductions in the future. This relief would be issued on the basis that Defendants have acted in a manner that violates the rights of all employees for the same reasons. The claim for injunctive relief falls easily within the scope of Rule 23(b)(2).

## CONCLUSION

The court DENIES the motion for decertification of the FLSA class (Doc. 251) and GRANTS the motion for certification of the Vermont labor law claims (Doc. 252).

Dated at Rutland, in the District of Vermont, this ___ day of May, 2019.

Geoffrey W. Crawford, Chief Judge
United States District Court